UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CARLA NAVEDO, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 15-cv-30051-KAR |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security Administration | ) | |
| | ) | |
| Defendant | ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR ORDER
REVERSING THE COMMISSIONER'S DECISION AND DEFENDANT'S MOTION TO
AFFIRM DECISION OF THE COMMISSIONER
(Dkt. Nos. 18 & 23)

ROBERTSON, U.S.M.J.

I.   INTRODUCTION

This is a request by Plaintiff Carla Navedo ("Plaintiff") for judicial review of a final

decision by the acting Commissioner of the Social Security Administration ("Commissioner")

regarding Plaintiff's entitlement to Social Security Disability Insurance ("SSDI") benefits based

on her chronic back pain associated with degenerative disc disease, status post spinal fusion, and

her affective disorder.  *See* 42 U.S.C. § 405(g).  Plaintiff, who is proceeding *pro se*, seeks review

of the Commissioner's decision denying her such benefits, which is memorialized in a September

17, 2013 decision by an administrative law judge ("ALJ").  Plaintiff has moved to reverse the

Commissioner's decision or, in the alternative, to remand the decision (Dkt. No. 18), and the

Commissioner, in turn, has moved to affirm (Dkt. No. 23).

The parties have consented to this court's jurisdiction.  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the following reasons, the court will allow the Commissioner's motion to affirm, and deny Plaintiff's motion for an order reversing the Commissioner's decision.

II.    FACTUAL BACKGROUND

Plaintiff was 32 years old at the time she stopped working on July 28, 2011 (Administrative Record ("A.R.") at 28, 37, 80, 209).  She is a high school graduate who was trained to be a Certified Nurse's Assistant ("CNA") (*id.* at 48, 208).  Plaintiff previously was employed as a CNA, a retail salesperson, a machine operator, and, most recently, as an outreach worker (*id.* at 49, 186, 208-09).  In her application for SSDI, Plaintiff alleged that she was disabled due to back disorders, including spondylosis[1] and chronic pain, and due to depression (*id.* at 48, 80).

III.    PROCEDURAL BACKGROUND

Plaintiff applied for SSDI on August 22, 2011, alleging an onset of disability on July 31, 2011 (*id.* at 28, 80).  The application was denied initially and upon reconsideration (*id.* at 28, 90, 106).  Following a hearing on August 6, 2013, the ALJ issued a decision on September 17, 2013, finding that Plaintiff was not disabled and denying Plaintiff's claims (*id.* at 28-39).  The Appeals Counsel denied review (*id.* at 1-4).  Thus, the ALJ's decision became the final decision of the Commissioner.  This appeal followed.

IV.    DISCUSSION

A.    Legal Standards

1.    Standard of review

---

[1] "Spondylosis" is defined as "any of various degenerative diseases of the spine." *Merriam-Webster's Medical Dictionary* 771 (2006 ed.).

The District Court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for a rehearing. *See* 42 U.S.C. § 405(g). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). The court reviews questions of law de novo, but must defer to the ALJ's findings of fact if they are supported by substantial evidence. *See id*. (citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999)). Substantial evidence exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion.'" *Irlanda Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.,* 647 F.2d 218, 222 (1st Cir. 1981)). In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *See id.* So long as the substantial evidence standard is met, the ALJ's factual findings are conclusive even if the record "arguably could support a different conclusion." *Id.* at 770. That said, the Commissioner may not ignore evidence, misapply the law, or judge matters entrusted to experts. *See Nguyen*, 172 F.3d at 35.

      2.    <u>Standard for entitlement to Social Security Disability Insurance benefits.</u>

In order to qualify for SSDI, a claimant must demonstrate that she was disabled within the meaning of the Social Security Act (the "Act") prior to the expiration of her insured status for disability insurance benefits. *See* 42 U.S.C. § 423(a)(1)(A) and (D). "Plaintiff's . . . insured status, for purposes of SSDI, [is] not challenged. The only question is whether the ALJ had substantial evidence with which to conclude that Plaintiff did not suffer from a disability." *Bitsacos v. Barnhart*, 353 F. Supp. 2d 161, 165-66 (D. Mass. 2005).

The Act defines disability, in part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual is considered disabled under the Act

> only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. § 423(d)(2)(A).  *See generally Bowen v. Yuckert,* 482 U.S. 137, 146–49 (1987).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in regulations promulgated under the Act.  *See* 20 C.F.R. § 404.1520(a).  The hearing officer must determine:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See id*; *see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  *See* 20 C.F.R. § 404.1520.

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's "residual functional capacity" ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the

claimant can do other work.  *See id*.  "The RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  Social Security Ruling ("SSR") 96-8p, 1996 WL 374187, at *2 (July 2, 1996).  Put another way, "[a]n individual's RFC is defined as 'the most you can still do despite your limitations.'"  *Dias v. Colvin*, 52 F. Supp. 3d 270, 278 (D. Mass. 2014) (quoting 20 C.F.R. § 416.945(a)(1)).  "Work-related mental activities generally . . . include the abilities to:  understand, carry out and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision and co-workers and work situations; and deal with changes in a routine work setting."  SSR 96-8p, 1996 WL 374187, at *6.

The claimant has the burden of proof through step four of the analysis.  At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding impairment(s).  *See Goodermote*, 690 F.2d at 7.

      B.    <u>Medical Records</u>

          1.    <u>Physical condition</u>

Plaintiff presented the ALJ and the court with medical records that spanned the period from 2009 through July 2013 to support her claim of disability due to chronic back pain.  The records of Zhongmo Yu, M.D., Plaintiff's Primary Care Physician ("PCP") from the Riverbend Medical Group ("Riverbend"), included the May 2011 discharge summary of the MVA Center for Rehabilitation, where Plaintiff was referred after a third motor vehicle accident in December

2010 (A.R. at 259).[2]  The discharge summary stated that Plaintiff denied any back pain (*id.*).

"Her physical examination [by the MVA Center for Rehabilitation] revealed full and pain-free

range of motion of her spine and shoulders" (*id.*).

    Plaintiff began treating with Pioneer Spine and Sports Physicians, P.C. ("Pioneer") in

January 2006 for low back pain (*id.* at 299-301, 306-308, 474).  An MRI on July 26, 2011

showed "spondylolysis at L5-S1 with grade I slippage," "no central disc herniation or stenosis,"

and "no significant neurocompression" (*id.* at 328, 341-342, 346).[3]  Plaintiff resumed physical

therapy at Pioneer in July 2011 because it had provided relief in the past (*id.* at 267-270, 332,

335-336).  In August 2011, Plaintiff received a left L5 transforaminal epidural steroid injection,

which provided some relief (*id.* at 325, 326, 340).  Plaintiff reported that the pain was most

intense "with lumbar flexion and going from a sitting to standing position" (*id*. at 325).  Lumbar

range of motion was "significantly reduced in all planes," but her gait was not antalgic[4] and her

hip, knee, and ankle range of motion were full and without pain (*id.* at 326).  After the injection,

Pioneer's records of August 30, 2011 indicate that Plaintiff could return to work on September

29, 2011 (*id.* at 349).

    Marc Linson, M.D. examined Plaintiff on August 19, 2011 for a surgical evaluation (*id.*

at 328, 346).  Dr. Linson's records indicate that Plaintiff had "[n]early full back motion" (*id.* at

346).  Straight leg raising, hip irritability testing, heel-toe walking, and leg neurologic testing

---

[2] Plaintiff was involved in a motor vehicle accident in 2003 (A.R. at 474).  Her low back pain symptoms "resolved" two to three months after the accident (*id.*).  She was involved in a second motor vehicle accident in 2004 (*id.*).

[3] The MRI records showed that there was no significant change in Plaintiff's condition between 2006 and July 2011 (*id.* at 341-42, 436).

[4] "An antalgic gait suggests that a patient is walking in a certain manner in order to avoid pain." *Saenz v. Colvin*, 61 F. Supp. 3d 195, 198 n.2 (D. Mass. 2014) (citing *Stedman's Medical Dictionary* 65 (25th ed. 1990)).

were unremarkable (*id.*).  X-rays confirmed Dr. Linson's diagnosis of spondylosis and indicated "minimal slippage at L5-S1" (*id.*).  Dr. Linson opined that Plaintiff was not "structurally bad enough" to consider surgery and recommended that she continue treatments with her other providers and that she be re-examined in a year (*id.*).

In September 2011, Pioneer recorded that Plaintiff's active and passive lumbar spine range of motion was mildly to moderately restricted in all planes, and that Plaintiff could be considered for a spinal cord stimulator trial (*id*. at 436-37).  In October 2011, Plaintiff's pain was significantly relieved by Pioneer's facet joint injections (*id.* at 373).  A spinal cord stimulator, which was implanted on a trial basis in December 2011, relieved Plaintiff's pain (*id*. at 99, 378-379).  Prior to the implantation, her pain was between 8 and 9 on a scale of 10, while it was between 4 and 5 afterward (*id.* at 371, 718).  She went from sitting to standing and from standing to sitting with "mild apparent discomfort" (*id.* at 718).  As a result, Plaintiff was referred to Scott Cowan, M.D. of New England Orthopedic Surgeons ("NEOS") for surgery to implant a permanent spinal cord stimulator (*id.* at 99, 372, 597, 718-19).  Dr. Cowan's records of February 2012 state that Plaintiff was not in acute distress (*id.* at 99, 592).  She arose from a sitting position "without difficulty" (*id.* at 592).  She had sixty percent range of motion of her back, while she had full range of motion of her hips and knees (*id.*).  Dr. Cowan recommended against the permanent implant of a dorsal column stimulator because Plaintiff had a "structural issue" that could be repaired by an anterior lumbar interbody fusion at the L5-S1 level, which Dr. Cowan performed in April 2012 (*id.* at 414, 592).[5]

---

[5] "The anterior lumbar interbody fusion involved replacing one of [her] spinal discs with a bone graft substitute."  *Schomas v. Colvin*, 732 F.3d 702, 705 (7th Cir. 2013).

Six weeks after Plaintiff's surgery, Dr. Cowan reported that Plaintiff's back pain and left thigh pain had improved and she was no longer using a walker and a cane (*id.* at 412, 414-15, 422). She transitioned easily and walked without difficulty (*id.* at 422). Although her gait was within normal limits, her range of motion was "quite limited secondary to pain" (*id.*). Dr. Cowan recommended physical therapy and continuation of the morphine medication (*id.*). In June 2012, Plaintiff reported that physical therapy had not helped to alleviate her back pain and radiating pain (*id.* at 589). She continued to take Neurontin and morphine (*id.*). X-rays showed a "nicely consolidated fusion mass at the L5-S1 level," which were otherwise "unremarkable" (*id.* at 589-90). An MRI was also unremarkable; that is, there were no disc lesions at any other level and "the operative level is fine" (*id.* at 586-88).

Seven months after surgery, in October 2012, Plaintiff reported no improvement in her pain (*id.* at 585). She was still taking morphine and Neurontin for pain relief (*id.*). Dr. Cowan's report indicated that she transitioned fairly easily, her gait was within normal limits, and she had no focal neurologic deficits in either lower extremity (*id.*). Her range of motion, however, remained limited to sixty to seventy percent of normal (*id.*). Because there were no identified structural lesions, Dr. Cowan referred Plaintiff to Pioneer for an initial pain management evaluation (*id.*).

In October 2012, Pioneer recommended that Plaintiff continue using the TENS unit, [6] which afforded her partial relief of the bilateral buttock pain that she experienced after surgery (*id.* at 713-15). Plaintiff received an intra-articular bilateral sacroiliac joint injection for pain relief in November 2012 (*id.* at 722). This improved the pain in her right buttock, but not the

---

[6] A "TENS" unit is an abbreviation for a "transcutaneous electrical nerve stimulator." *Merriam-Webster's Medical Dictionary* at 752 (2006 ed.).

pain in her left side (*id.* at 710-11).  She also complained of pain in her sacrum and lower thoracic spine (*id.*).  After the injection, her lumbar range of motion was seventy percent of normal and she walked with a slight antalgic gait (*id.* at 634, 711).  Plaintiff's gait temporarily improved with steroids and physical therapy (*id.* at 619, 695, 702, 704, 705), but she was referred for pain medication management when her chronic low back pain was not relieved by more conservative methods (*id.* at 693, 699-700).  Because the MRI did not show an apparent physical source of her pain, S1 radiculopathy[7] was suspected to be its cause (*id.* at 695, 705).  It is notable that a Riverbend record of January 2013 noted no back pain (*id.* at 668).

At Plaintiff's initial pain medication management appointment at Pioneer in April 2013, Plaintiff's functional abilities were close to being fully independent; that is, she was able to dress herself, but, at times, needed help with her shoes due to pain, and she could prepare her own meals, feed herself, and bathe (*id.* at 693).  Although Pioneer expected Plaintiff to quit smoking within a week and to have her urine screened on the day of the appointment, she refused to leave a urine sample and "was angry" (*id.* at 695-96).  She, apparently, did not complain of back pain during a visit to Riverbend in May 2013 and her back showed "good flexion and extension" (*id*. at 656, 658).

Plaintiff remained "close to fully independent" in terms of functional abilities in May and July 2013, and she did not exhibit any signs of apparent distress to the Pioneer personnel on those dates (*id*. at 685-86, 689-90).  Although she walked with an antalgic gait, she stood "comfortably erect" and her posture was "normal" (*id.* at 686).  Her straight leg raise was normal

---

[7] "Radiculopathy is 'a disease of the nerve roots' . . . or a 'disorder of the spinal nerve roots.'" *Warden v. Metro. Life Ins. Co.*, 574 F. Supp. 2d 838, 842 n.1 (M.D. Tenn. 2008) (quoting *Stedman's Medical Dictionary* 1503 (27th ed.1999)).

bilaterally (*id.*).  She was "[a]pprehensive and guarded" with range of motion testing due to pain (*id.* at 686, 691).  She would not attempt extension or flexion, and attempted lateral bending to a "very limited" extent (*id.* at 686).  Plaintiff showed normal reflexes, coordination and mobility of all extremities (*id.* at 686-87, 691).  In addition to taking morphine and Gabapentin, Plaintiff used a heating pad, lumbar brace, TENS unit, and her recliner to relieve her pain (*id.* at 685, 689).[8]

### 2.    Mental condition

Plaintiff offered mental health treatment records from the Center for Psychological and Family Services, Inc. ("CPFS") that covered the period from January 2008 to June 2013 (*id.* at 310-22, 361-64, 366-69, 399-409, 507-23, 526-40, 638-52).  The ALJ focused on the period from the alleged onset of the disability in July 2011 through June 2013 (*id.* at 35-36).  Plaintiff's depression and anxiety were treated with medication and therapy (*id.* at 310-311, 366-69, 399-407, 507-16, 518-23, 526-527, 638-52).  Her Global Assessment of Functioning ("GAF") scores ranged from 52 to 60 during the relevant period (*id.* at 311, 369, 402, 406, 407, 510, 521, 642, 650, 652). [9]

Plaintiff had GAF scores of 60 in August and November 2011 (A.R. at 310-311, 368-369).  According to a questionnaire that was completed by therapist Aimee Kurtzhalts, M.A. of

---

[8] Plaintiff was prescribed Percocet for "breakthrough pain," but it was discontinued in July 2013 because it upset her stomach (A.R. at 687).

[9] "GAF 'evaluates overall psychological functioning on a scale of 0–100 that takes into account "psychological, social, and occupational functioning."'" *Tardiff v. Astrue*, No. 11-CV-17-JD, 2012 WL 777484, at *1, n. 2 (D.N.H. Mar. 7, 2012) (quoting *Washington v. Astrue,* Civil Action No. 10-10416-DPW, 2011 WL 4407432, at *1, n. 3 (D. Mass. Sept. 20, 2011), quoting *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. rev. 2000)).

CPFS in September 2011 and signed by Kurtzhalts and Alan Stone, M.D., Plaintiff maintained a "select few" social relationships (*id.* at 362). She did not have any deficits in concentration, attention, or memory (*id.*). She was able to work with others and did not require excessive supervision (*id.* at 363). "[R]outine stress" upset her, but she was able to "regroup[]" (*id.*).

Although Plaintiff's mood was "stable" after her surgery in April 2012, the next month she was "extremely depressed," had suicidal thoughts, and her GAF score was 52 (A.R. at 406, 407, 522). "She [was] feeling hopeless that things will not get better and that she will be in pain indefinitely" (*id.* at 407). In June 2012, Plaintiff was "more energetic" and was "able to laugh" (*id.* at 513).

Her depression and back pain continued from August 2012 through June 2013, when her GAF scores ranged from 54 in August 2012 to 56 in June 2013 (*id.* at 509-510, 640-641). Her back pain and her teenage children's behavior caused her stress during this period (*id.* at 640, 642). She was calm and less anxious in March 2013 (*id.* at 647). In May 2013, Plaintiff did not report any "sleep disturbance, mood disorder or recent psychosocial stressors" during an examination at Riverbend (*id.* at 656), and she stated that she was a "good mom" and girlfriend, that she was a caring person, and that she "like[d] to have fun" (*id.* at 640). In June and July 2013, Plaintiff did not exhibit any signs of "acute distress" during her examinations by Dr. Yu, by NEOS, and by a Pioneer physician (*id.* at 655-56, 681, 685-86).

C.    State Agency Examiners

After the state agency medical consultant, K. Malin Weeratne, M.D., reviewed Plaintiff's medical records from July and August 2011, including reports from Dr. Yu, Pioneer, and Dr. Linson, Dr. Weeratne opined that Plaintiff was not disabled (*id.* at 81-84, 87, 90-91). Based upon Dr. Weeratne's review of Plaintiff's records in November 2011, Dr. Weeratne's assessment

indicated that Plaintiff could:  (1) occasionally lift and/or carry 20 pounds; (2) frequently lift

and/or carry 10 pounds; (3) stand and/or walk, with normal breaks, for about six hours in an

eight hour workday; (4) sit, with normal breaks, for about six hours in an eight hour workday; (5)

push and/or pull without limitation; (6) frequently climb ramps and stairs, balance, stoop, kneel,

and crouch; and (7) occasionally climb ladders, ropes, and scaffolds, and crawl (*id*. at 86-87).

Dr. Weeratne further opined that Plaintiff should avoid concentrated exposure to hazards, such as

machinery and heights, but had no other environmental, visual, or communicative limitations

(*id.*).

Robin McFee, D.O. reconsidered Plaintiff's application in February 2012, before

Plaintiff's surgery (*id*. at 92, 103, 107, 414-15).  It is notable that Plaintiff did not allege that her

condition had become worse between the time of the initial assessment and the reconsideration

(*id*. at 99).  Like Dr. Weeratne, Dr. McFee reviewed the records of Riverbend and Pioneer (*id*. at

94-100).  Dr. McFee's RFC assessment mirrored Dr. Weeratne's with one exception:  Dr. McFee

found that Plaintiff could stoop occasionally, as opposed to Dr. Weeratne's opinion that she

could stoop frequently (*id.* at 102).

In November 2011, Lawrence Langer, Ph.D., performed a psychiatric review technique

("PRT") analysis[10] of Plaintiff's mental impairment (*id.* at 84-85).  Dr. Langer concluded that

Plaintiff was not disabled (*id*. at 90).  He opined that Plaintiff's affective disorders were severe,

but that they imposed only mild restrictions on her activities of daily living, and her ability to

maintain social functioning (*id*. at 84-85).  Although Plaintiff had moderate difficulty in

---

[10] "The [psychiatric] review technique is used to rate the severity of mental impairments at Steps
Two and Three of the sequential evaluation process, and also serves as a backdrop for the more
detailed mental RFC assessment at Step Four." *Pelletier v. Colvin*, C.A. No. 13-651, 2015 WL
247711, at *12 (D.R.I. Jan. 20, 2015).

maintaining concentration, persistence, or pace, she had no other limitations on her ability to perform sustained work (*id.* at 85, 88).  She had not experienced repeated episodes of decompensation of extended duration (*id.* at 85).[11]  Ruth Aisenberg, Ph.D., completed a reassessment in March 2012 (*id.* at 100-01).  Like Dr. Langer, Dr. Aisenberg found that Plaintiff was not disabled (*id*. at 106).  Her findings regarding Plaintiff's paragraph B criteria echoed Dr. Langer's (*id*. at 100); that is, Plaintiff's ability to concentrate and to perform at a consistent pace was moderately limited (*id*. at 104).  In addition, Dr. Aisenberg opined that Plaintiff was moderately limited in her ability to carry out detailed instructions (*id.*).  Dr. Aisenberg stated that Plaintiff's "[w]ork pace would be variable, depending on pain" (*id.*).

D.     Plaintiff's Function Report

Plaintiff submitted a function report on September 15, 2011 (*id.* at 201).  She stated that, except for brushing her teeth, preparing food -- sandwiches and T.V. dinners -- and making sure her children got off to school, she sat in her recliner watching T.V. all day (*id.* at 194-95, 196, 198).  Her inability to stand for long periods of time made it difficult to cook, to wash dishes, and to do other housework (*id.* at 196-97).  According to Plaintiff, her outings were limited to medical appointments because she was not able to walk for more than one or two minutes (*id*. at 197, 198, 199).  Pain interfered with her sleep (*id.* at 195).  Her condition affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel and climb stairs, but did not impact her memory, concentration, or understanding (*id*. at 199).  She was able to use her hands, to complete tasks, to follow instructions, and to get along with others (*id.* at 199-200).

E.     The ALJ Hearing

---

[11] "The four factors to which [Dr. Langer] directed his opinion are the so-called 'Paragraph B' criteria." *Littlefield v. Colvin*, No. 14-CV-53-LM, 2015 WL 667641, at *3 n.7 (D.N.H. Feb. 17, 2015).

Plaintiff and independent Vocational Expert Ms. Bailey ("VE") testified before the ALJ. Plaintiff testified that she began getting treatment for back pain in about 2005, but in 2011 it "got really severe where [she] couldn't do [her] job any more" (*id.* at 50, 63). She was treated with physical therapy, injections, and a trial of a neurostimulator before she underwent surgery in 2012 (*id.* at 50-51). The surgery -- a fusion at L5-S1 and a discectomy -- did not alleviate the pain (*id.* at 51-52, 54). At the time of the hearing, she took morphine and Neurontin each day, and took Percocet as needed for the constant pain in her lower back, which radiated into her left leg (*id.* at 51, 58). Although she used a brace and a TENS unit "a couple of times a week," they did not alleviate the pain in her bones (*id.* at 54). According to Plaintiff, epidurals and trigger point injections helped for a "couple of weeks," but physical therapy did not alleviate the pain at all (*id.* at 55).

Plaintiff testified that she could sit or stand for about thirty minutes at a time and could walk for five minutes without "being exhausted" (*id.* at 57-58). The pain intensified if she sat or stood for "too long," and if she walked (*id.* at 59, 60). She spent most days in her recliner with her legs up (*id.* at 57, 63). She was, however, able to fold laundry and to drive (*id.* at 57, 62).

Plaintiff testified that she sought treatment for depression because she was suicidal and anxious (*id.* at 60). She also suffered from insomnia due to pain (*id.* at 61-62). At the time of the hearing, she saw a therapist every two weeks and took medication (*id.* at 61).

The ALJ asked the VE if there was any light work that a person with Plaintiff's age, education, and work experience could perform given the following limitations: occasionally lifting 10 pounds; frequently lifting more than 10 pounds; standing or walking for four hours during an eight hour day; sitting for six hours but needing a sit-stand option; occasionally crawling and balancing; never pushing or pulling with the lower extremeties, stooping, kneeling,

crouching or crawling; avoiding temperature extremes and hazards; and the inability to maintain

rate pace production (*id*. at 65).   The VE opined that, considering those limitations, there were

light jobs, specifically employment as a record clerk or an appointment clerk, which were

available in the national and regional economy (*id*.).   No jobs, however, were available if the

person would be absent from work for more than two days a month (*id.* at 65-66).

> F.   The ALJ's Decision

Following the hearing on August 6, 2013, the ALJ denied Plaintiff's claim on September

17, 2013 (*id.* at 28, 39).   In determining whether Plaintiff was disabled, the ALJ conducted the

five-part analysis required by the regulations.   At the first step, the ALJ found that Plaintiff had

not engaged in substantial gainful activity since the alleged onset date of July 31, 2011 (*id.* at

30).   20 C.F.R. § 404.1571 *et seq.*.   At step two, the ALJ found that Plaintiff was severely

impaired due to chronic back pain associated with degenerative disc disease, status post spinal

fusion; and an affective disorder (A.R. at 30).   *See* 20 C.F.R. § 404.1520(c).   The ALJ found that

Plaintiff's carpal tunnel syndrome was not severe (A.R. at 30-31).

At step three, the ALJ concluded that Plaintiff's severe impairments, either alone or in

combination, did not meet or medically equal the severity of one of the listed impairments in 20

C.F.R. Part 404, Subpart P, Appendix 1 (*id.* at 31).   In addition, after applying the four broad

functional areas (paragraph B criteria)[12] described in the regulations to determine the severity of

---

[12] In order to make a showing that Plaintiff met the paragraph B criteria necessary for a finding of a "severe" mental disorder as defined in the regulations, she was required to establish that her condition resulted in at least two of the following:  "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration[.]"  20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04 and 12.06.  *See Escobar v. Colvin*, Civil Action No. 13-10186-JGD, 2014 WL 1159822, at *11 (D. Mass. Mar. 20, 2014).  "The rating 'marked' is applied using a 'five point scale:  none, mild, moderate, marked and extreme.'"  *Dias*, 52 F. Supp. 3d at 279 (quoting 20 C.F.R. § 416.920a(c)).

Plaintiff's affective disorder, the ALJ determined that Plaintiff's limitations in the areas of daily living and social functioning were mild, that her difficulties with "concentration, persistence or pace" were moderate "due to interference from chronic pain and psychological symptoms," and that Plaintiff did not experience any episodes of decompensation that were of extended duration (*id.*). The ALJ concluded that Plaintiff's mental impairments would not limit her ability to perform basic mental work activities and, thus, did not meet or equal listing 12.04 for the purpose of assessment at step three of the sequential evaluation process (*id.* at 31-32). *See* 20 C.F.R. § 404.1525; 20 C.F.R. Pt. 404, Subpt. P., App. 1 § 12.04.

Before proceeding to step four, the ALJ determined that Plaintiff had the RFC to perform light work,[13] with the following additional limitations:

> she can lift 10 pounds occasionally and less than 10 pounds frequently; she can stand 4/8 hours for a workday and sit for 6/8; she can only occasionally climb and balance, but never kneel, crouch, crawl and stoop; she cannot use her low extremeties for pushing and pulling; she requires a sit-stand option; she must avoid concentrated exposure to extremes of temperature and hazardous work conditions. The [Plaintiff] cannot maintain rate pace production due to interference from psychological symptoms. [14]

(A.R. at 32).

_____

[13] The Social Security Administration ("SSA") defines light work as that which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing light work, [a claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the SSA] determine[s] that he or she can do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567.

[14] The ALJ recognized that the RFC used at steps four and five of the sequential evaluation process required a more detailed assessment than that employed at steps two and three of the sequential evaluation process (A.R. at 32). As a result, the ALJ's RFC reflected "the degree of limitation [she has found in [Plaintiff's] 'paragraph B' mental function analysis" (*id.*).

At step four, the ALJ found that Plaintiff was not able to perform any past relevant work (*id*. at 37).  *See* 20 C.F.R. § 404.1565.  Finally, at step five, the ALJ determined, based on the testimony of the VE, that Plaintiff can perform jobs that exist in significant numbers in the national economy taking into account Plaintiff's age, education, work experience, and RFC, and, therefore, Plaintiff was not disabled  (A.R. at 37-38).

G.     Plaintiff's Objections

Plaintiff, who is proceeding *pro se* after having been represented by counsel at the hearing, makes a general objection to the ALJ's decision (Dkt. No. 18; A.R. 45).  "In light of [P]laintiff's *pro se* status, the court holds her pleadings to 'less stringent standards than formal pleadings drafted by lawyers,'" *Ming v. Astrue,* No. 07-CV-4567(DLI)(MSG), 2009 WL 2495947, at *4 (E.D.N.Y. Aug. 13, 2009) (quoting *Haines v. Kerner,* 404 U.S. 519, 520 (1972)), and "will interpret [her] pleadings 'to raise the strongest arguments that they suggest.'" *Ming*, 2009 WL 2495947, at *4 (quoting *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir. 2006)).  Because Plaintiff's application for disability benefits was based upon her alleged physical and mental impairments, and because the ALJ's decision addressed both conditions, the court will discuss each one in turn.

1.     The ALJ did not err in determining that Plaintiff was not under a disability due to her chronic back pain.

Plaintiff's motion can be read to contend that the ALJ improperly evaluated the impact of her pain and how it affects her functioning so that the ALJ's RFC and her decision that Plaintiff is not disabled is not supported by substantial evidence.  "To qualify a claimant as disabled, her pain must be so severe 'by itself or in conjunction with other impairments, as to preclude any substantial gainful employment.'" *Cortez v. Astrue*, 848 F. Supp. 2d 1302, 1306 (D. Colo. 2012) (quoting *Talley v. Sullivan,* 908 F.2d 585, 587 (10th Cir. 1990), citing *Brown v. Bowen,* 801 F.2d

361, 362–63 (10th Cir. 1986)).  "To make this determination, the Commissioner must look to the medical record and the claimant's credibility."  *Cortez,* 848 F. Supp. 2d at 1306.  The ALJ undertook this examination.

Plaintiff's medical records, as well as the opinions of the non-examining state consultants and the hearing testimony, amply support the ALJ's RFC assessment that Plaintiff could perform light work with specific restrictions, including a sit-stand option (A.R. at 37-38).  The VE testified that jobs as a record clerk or an appointment clerk were available in the local economy (*id.* at 65).  Plaintiff, herself, indicated that her condition did not affect her use of her hands (*id.* at 199).

The ALJ observed that none of Plaintiff's treating or examining sources opined that she was disabled (*id.* at 36).  This lack of medical evidence buttresses the ALJ's determination.  *See Lane v. Comm'r of Soc. Sec.,* 100 F. App'x 90, 95 (3d Cir. 2004) (unpublished) ("Not one of [the claimant's] treating physicians opined that she was unable to work, let alone meet the modest demands of sedentary work.  This lack of medical evidence is very strong evidence that [the claimant] was not disabled.  In fact, none of [the claimant's] treating physicians concluded that she had any work-related functional limitations.  Absent such evidence, [the claimant] cannot establish disability under the Social Security Act") (citation omitted).  *Compare Konz v. Astrue*, Civil Action No. 09-11544-NMG, 2010 WL 5827402, at *7 (D. Mass. Nov. 8, 2010) (ALJ considered the absence of opinions from treating or examining physicians among other factors).  The ALJ, however, did not rely only on the absence of a treating provider's opinion in finding that Plaintiff was not disabled.  Instead, the ALJ undertook a comprehensive assessment of the numerous records that Plaintiff provided, and relied on the contents of these records, including statements by care providers and Plaintiff, in assessing Plaintiff's RFC (A.R. at 34-37).  *See*

*Quiros v. Astrue*, CA No. 07-044T, 2009 WL 196212, at *9-10 (D.R.I. Jan. 23, 2009) (ALJ's evaluation of the administrative record demonstrated that he did not dispose of claimant's case based on the lack of an opinion of a treating physician).

The ALJ also gave "great weight" to the opinion of the state agency medical consultant, Robin McFee, D.O., that Plaintiff was not disabled (*id.* at 37).  Although Dr. Weeratne and Dr. McFee opined on Plaintiff's RFC prior to her anterior discectomy and fusion at L5-S1 in April 2012, the state consultants' findings of "not disabled" were not contradicted by others' opinions (*id.* at 90-91, 106-07, 414, 420, 592).  In fact, no expert found – either before or after Plaintiff's surgery – that Plaintiff was disabled (*id.* at 36).  Dr. Weeratne's and Dr. McFee's RFCs were consistent with the post-surgical record medical evidence of July 2013, particularly the results of the MRI, which showed "a solid fusion" and "no structural lesions," and Pioneer's record that Plaintiff's posture was normal, her straight leg raises were negative bilaterally, and her functional ability was "close to fully independent" (*id.* at 35, 585-88, 685-86, 693).  Accordingly, the ALJ did not err in according the state consultants' opinions great weight, and in declining to fully credit Plaintiff's description of the extent of her physical restrictions (*id.* at 36-37, 57-60, 62-63). *See Conde v. Colvin*, Civil No. 15-cv-246-JD, 2016 WL 299017, at *4 (D.N.H. Jan. 25, 2016) (citing 20 C.F.R. § 404.1527(e)); *Cuffie v. Colvin*, Civil Action No. 12-cv-30140-DJC, 2013 WL 5437353, at *9 (D. Mass. Sept. 25, 2013).  *Compare Rooney v. Astrue,* Civil Action No. 10–11601–DJC, 2011 WL 6026908, at *10 (D. Mass. Dec. 5, 2011) (noting that "'[i]t was the duty of the ALJ to resolve [any] conflicts in the evidence,' and this Court must defer to the ALJ's judgment as long as it is supported by substantial evidence" (quoting *Konigsberg v. Astrue*, Civil Action No. 08-10120-NMG, 2010 WL 1794630, at *7 (D. Mass. Mar. 8, 2010)).  The ALJ's RFC modified the state agency consultants' RFCs to reflect additional limitations based on Plaintiff's

testimony and the ALJ's assessment of her credibility. *Compare* A.R. at 32 *with* A.R. at 86-87, 101-03.

The court concludes that the ALJ provided an adequate explanation for according the state agency experts' opinions of Plaintiff's RFC "great weight," and finds no error.

In light of the fact that Plaintiff's pain could not be traced to an observable physical abnormality, it is also clear from the opinion that the ALJ considered the appropriate factors in evaluating the limiting effects of Plaintiff's complaints of pain, which were the alleged cause of her disability. "Pain can constitute a significant non-exertional impairment." *Nguyen,* 172 F.3d at 36. "When a claim of disability is based on a subjective symptom, such as pain, a two-step analysis is conducted." *Dasilva-Santos v. Astrue*, 596 F. Supp. 2d. 181, 192 (D. Mass. 2009). In determining Plaintiff's RFC, the ALJ first considered all of Plaintiff's symptoms to the extent that they were consistent with the objective medical evidence and determined that Plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms" (A.R. at 32-33). 20 C.F.R. § 404.1567(b). *See Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 29 (1st Cir. 1986).

> Once it is found that a claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, the ALJ must evaluate evidence of the intensity and persistence of the symptoms, including statements from the claimant. 20 C.F.R. § 404.1529(c)(1) . . . . However, a claimant's subjective description of symptoms alone cannot establish disability; the ALJ must also consider any other available evidence, including the objective medical evidence, to determine whether the claimant's testimony is consistent with the remainder of the record. 20 C.F.R. §§ 404.1529(a), (c).

*Bourinot v. Colvin*, 95 F. Supp. 3d 161, 180 (D. Mass. 2015). The ALJ was thus required to make a finding about the credibility of Plaintiff's statements regarding the limitations caused by her pain. *See Masse v. Comm'r of Soc. Sec.,* No. CA 10-134 M, 2011 WL 2791283, at *6 (D.R.I. June 24, 2011); SSR 96–7p, 1996 WL 374186, at *1 (July 2, 1996). "If proof of disability is

based on subjective evidence and a credibility determination is, therefore, critical to the decision, 'the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding.'" *Quiros,* 2009 WL 196212, at *6 (quoting *Foote v. Chater,* 67 F.3d 1553, 1562 (11th Cir. 1995)).  The ALJ's credibility determination "is entitled to deference, especially when supported by specific findings." *Frustaglia v. Sec'y of Health & Human Servs.,* 829 F.2d 192, 195 (1st Cir. 1987).

The ALJ's finding -- that Plaintiff's "complaints of constant, incapacitating pain and psychological symptoms are neither reasonably consistent with [the objective medical findings contained in the record] nor sufficiently credible as additive evidence to support a finding of disability" -- is supported by substantial evidence (A.R. at 33, 34, 36).  "[T]he ALJ's explanation for finding a claimant less than fully credible need only be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight.'" *Traynham v. Astrue*, 925 F. Supp. 2d 149, 158 (D. Mass. 2013) (quoting SSR 96-7p, 1996 WL 374186, at *4).  The ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms . . . to be somewhat credible, but not to the extent alleged" (A.R. at 33).  Plaintiff testified that she could sit or stand for about thirty minutes and could walk for five minutes (*id.* at 57-58).  She spent most days in her recliner with her legs up (*id.* at 57, 63).  But she was able to fold laundry and to drive (*id*. at 57, 62).  She told the ALJ that she was unable to work because "the pain was too bad" (*id*. at 63).  The ALJ's finding of a "substantial disparity between the claimant's complaints" of the increase in pain after her surgery in April 2012 and the medical records is based on the ALJ's careful consideration of the medical reports that show the following:  Plaintiff denied back pain when she was discharged from the care of the MVA Center for Rehabilitation in May 2011,

and when she visited Riverbend in January and May 2013, which was after the surgery; the MRI three months after her surgery did not reveal an obvious physical source of her pain; she did not exhibit any signs of distress during post-surgical visits to Pioneer in May and July 2013; and her functional abilities, including her ability to bathe, were "close to being fully independent" on those dates (*id*. at 259, 586-88, 656, 658, 667-68, 685-86, 689-90).  These credibility determinations and inferences, which were based on inconsistencies in Plaintiff's statements, were within the ALJ's exclusive purview.  *See Irlanda Ortiz,* 955 F.2d at 769; *Frustaglia*, 829 F.2d at 195.  *Compare Brown v. Colvin*, 111 F. Supp. 3d 89, 102 (D. Mass. 2015) (claimant's "subjective reports of her daily life supported . . . the ALJ's determination of her physical limitation"); *Teixeira v. Astrue*, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) ("The hearing officer properly utilized [claimant's] testimony regarding her activities of daily living in assessing her credibility regarding the intense pain.  While a claimant's performance of household chores or the like ought not be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding").  *Contrast Rosa v. Astrue*, 783 F. Supp. 2d 179, 186 (D. Mass. 2011) (x-rays confirmed the physical condition that caused the claimant severe pain).

The ALJ's credibility assessment was supported by substantial evidence and provides no basis for remand or reversal of her determination that Plaintiff could perform light work, which includes sedentary work.

> 2.      The ALJ did not err in determining that Plaintiff was not disabled due to her mental impairments.

Despite the ALJ's determination that Plaintiff's affective disorder, specifically depression that was related to her chronic pain, was a severe impairment at step two of the sequential evaluation, the ALJ's finding that Plaintiff was not disabled due to a mental impairment was

supported by substantial evidence (A.R. at 30, 32).  The ALJ thoroughly considered Plaintiff's

treatment records and credibility in reaching her conclusion (A.R. 35-36).

As is the case with Plaintiff's physical impairment, the ALJ considered the fact that "no

treating or examining physician has suggested that [Plaintiff] has any . . . mental impairment that

prevents her from working" as one factor in her analysis (A.R. at 36).  *See Lane*, 100 F. App'x. at

95.  *Compare Watson v. Colvin,* CASE NO. 5:14CV00433 PSH, 2015 WL 6528211, at *3 (E.D.

Ark. Oct. 28, 2015) (holding that the absence of the opinion of a treating or examining physician

that claimant was disabled was one factor that the ALJ properly considered); *Overstreet v.

Astrue*, No. 4:11-CV-58-JG, 2012 WL 4355505, at *11 (E.D.N.C. Sept. 21, 2012) (ALJ properly

considered the lack of a treatment provider's opinion that claimant was disabled due to mental

impairments).  Her extreme depression and suicidal thoughts coincided with her recovery from

surgery in May 2012 (A.R. at 407, 414, 522).  She continued treatment with therapy and

medication (*id*. at 405-07, 515-16, 518-19).  She displayed more energy and was "able to laugh"

less than two months later (*id*. at 513).  Her mood was described as "euthymic" in August 2012

and March 2013 (*id*. at 507, 647).[15]  She did not report any mental health issues during an

examination at Riverbend in May 2013 (*id.* at 656).  Her PCP and physicians at NEOS and

Pioneer did not observe any signs of "apparent distress" in June 2013 (*id*. at 655-56, 681-82,

685-86).  Based upon these records, the ALJ found that Plaintiff's complaints of mental

impairments were "not sufficiently credible as additive evidence to support a finding of

disability" (*id*. at 33, 36).  Instead, she found that Plaintiff's depression and anxiety was

---

[15] "Euthymic . . . is defined as 'joyfulness; mental peace and tranquility.'"  *Whitzell v. Astrue*, 792
F. Supp. 2d 143, 147 (D. Mass. 2011) (quoting *Stedman's Medical Dictionary* 678 (28th ed.
2006)).

"generally adequately controlled when she is compliant with therapy and prescribed medications" (*id.*).  This credibility determination is supported by the medical evidence.  *See Frustaglia,* 829 F.2d at 195 (holding that an ALJ's credibility determination "is entitled to deference, especially when supported by specific findings"); *Cohen v. Massanari*, No. CIV.A. 01-11084RWZ, 2002 WL 1424580, at *3 (D. Mass. July 2, 2002), *aff'd sub nom. Cohen v. Barnhart*, 61 F. App'x 722 (1st Cir. 2003) ("An ALJ's credibility determination is owed considerable deference").

Plaintiff's GAF scores ranged from 52 to 56 after the surgery (*id.* at 405-07, 509-10, 641, 642, 649-52).

> The [GAF] score is used to rate an individual's overall level of functioning. *See* Am. Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text revision 2000) (hereinafter *DSM–IV–TR*).  A score of 51 to 60 reflects "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *DSM–IV–TR* 34.  However, the Fifth edition of the *Diagnostic and Statistical Manual of Mental Disorders* (2013) (hereinafter "*DSM–V* ") no longer uses GAF scores as a diagnostic tool for assessing a patient's functioning because of the questionable probative value of such scores.  *DSM–V* 16.

*Hagan v. Colvin*, 52 F. Supp. 3d 167, 169 n.1 (D. Mass. 2014).  The ALJ did not give Plaintiff's GAF scores undue weight when she assessed the evidence (A.R. at 35-37).  Instead, the ALJ mentioned them along with the other evidence (*id.*).  *Contrast Hall v. Colvin*, 18 F. Supp. 3d 144, 153 (D.R.I. 2014) (ALJ erred by relying on GAF scores "to discredit or find credible certain medical evidence"); *Martinez v. Colvin*, Civil Action No. 13-30124-KPN, 2014 WL 3735889, at *3 (D. Mass. July 11, 2014) (ALJ erred by exclusively relying on claimant's GAF score "[g]iven the limited insight a GAF score provides regarding a claimant's ability to function").

The ALJ gave the state consultants' opinions of Plaintiff's mental health "great weight" (A.R. at 37).  "[T]he amount of weight that can properly be given the conclusions of non-

testifying, non-examining physicians 'will vary with the circumstances, including the nature of the illness and the information provided the expert.'" *Rose v. Shalala,* 34 F.3d 13, 18 (1st Cir. 1994) (quoting *Berrios Lopez v. Sec'y of Health & Human Servs.*, 951 F.2d 427, 431 (1st Cir. 1991)(per curiam). "The First Circuit has held that an RFC assessment of a non-examining medical advisor, when based on review of evaluations by a claimant's treating sources, may constitute substantial evidence to support a finding of non-disability." *Bourinot,* 95 F. Supp. 3d at 179 (citing *Rodriguez v. Sec'y of Health & Human Servs.,* 893 F.2d 401, 403 (1st Cir. 1989)). "Further, SSA regulations specifically provide that in appropriate circumstances, 'opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.'" *Bourinot*, 95 F. Supp. 3d at 179-80 (quoting SSR 96–6p, 1996 WL 374180, at *3 (July 2, 1996)). This is an "appropriate circumstance" in light of the absence of an opinion from any treatment provider that Plaintiff was disabled (A.R. at 36). *Bourinot*, 95 F. Supp. 3d at 179.

Although the state consultants found that Plaintiff's affective disorders were "severe" and the ALJ made this finding for purposes of step two of the sequential analysis, the level of severity at step two did not control the ALJ's decision (A.R. at 30, 84, 100). "A finding of severity at step two requires 'only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered.'" *Huertas v. Astrue*, 844 F. Supp. 2d 197, 204 (D. Mass. 2012) (quoting SSR 85–28, 1985 WL 56856, at *3 (1985)). Step two's severity requirement is "a *de minimis* policy, designed to do no more than screen out groundless claims." *McDonald v. Sec'y of Health & Human Servs.,* 795 F.2d 1118, 1124 (1st Cir. 1986). "Thus, standing alone, a finding of severity at step two does not require a

further finding that the impairments had a negative impact on a claimant's residual functional capacity at step four." *Huertas*, 844 F. Supp. 2d at 204.  Here, although in 2011 both Plaintiff and her treatment providers at CPFS indicated that Plaintiff did not have any deficits in concentration, the agency consultants opined in their PRTs that Plaintiff had moderate difficulty in maintaining concentration, persistence, and pace "due to exacerbations of pain causing increased depression" (A.R. at 37, 85, 88, 104, 362).  The agency consultants' opinions of Plaintiff's ability to engage in work-related activities mirrored those of her treatment providers in other respects (*id*. at 84-85, 88, 100-01, 103-04, 199, 362-64).[16]  The RFC reflected Plaintiff's impaired ability to maintain concentration, persistence or pace, as determined by the two consultants in their PRTs (A.R. at 85, 100).  *See Sage v. Astrue*, No. 1:11CV00077, 2012 WL 4414942, at *5 (W.D. Va. June 17, 2012) ("The ALJ concluded that [claimant's] mental impairments were severe and included certain limitations in the RFC to reflect the effect of those impairments as shown by the evidence") (citing 20 C.F.R. §§ 416.927(e), 416.946(c) (2011)); *McHugh v. Astrue,* Civil No. 09–104–BW, 2009 WL 5218059, at *4 (D. Me. Dec. 30, 2009) ("This court has indicated that mental RFC findings typically should reflect, and be consistent with, the degree of impairment found by way of use of a PRT[]").

Because the record supports the ALJ's determination of Plaintiff's RFC, and because there were jobs in the local economy for a person with Plaintiff's RFC, including her mental limitations, the ALJ's determination should be affirmed.

H.    New Evidence

---

[16] The Commissioner indicates that the ALJ did not "specifically mention" Dr. Stone's opinion (Dkt. No. 24 at 17 n.5).  Although the ALJ did not name Dr. Stone, she considered the assessment that he and Aimee Kurtzhalts, M.A., signed in September 2011 (A.R. at 36, A.R. at 361-64 [Ex. 8F]).

In connection with Plaintiff's appeal to this court, she indicated that in September 2015 she was diagnosed with "a bulged dis[c] and a bone spur" in her neck (Dkt. No. 18), and submitted an MRI report of her cervical spine, which is dated September 13, 2015 (Dkt. No. 18-1). The report indicates "[a]t C5-C6,[17] there is a broad-based posterior disc-osteophyte complex with a superimposed central disc herniation. This mildly impinges the cervical spinal cord which is otherwise normal in signal. . . . No evidence of existing nerve root impingement" (Dkt. No. 18-1). Because the ALJ's decision was issued on September 17, 2013, the MRI report is not part of the administrative record (A.R. at 39). The court "may review the ALJ decision solely on the evidence presented to the ALJ." *Mills v. Apfel*, 244 F.3d 1, 5 (1st Cir. 2001). "With respect to the issue of remand, 42 U.S.C. § 405(g) provides, in relevant part, that '[t]he [reviewing] court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is *material* and that there is *good cause* for the failure to incorporate such evidence into the record in a prior proceeding[.]'" *Konz,*, 2010 WL 5827402, at *9. "To be material, the evidence must be 'both relevant to the claimant's condition during the time period for which benefits were denied and probative.'" *Beliveau ex rel. Beliveau v. Apfel*, 154 F. Supp. 2d 89, 94 (D. Mass. 2001) (quoting *Tirado v. Bowen,* 842 F.2d 595, 597 (2d. Cir. 1988)). "Interpreting the materiality requirement of § 405(g), the First Circuit has held that remand to the Commissioner is only appropriate if, in light of the proposed evidence, the Commissioner's decision '"might reasonably have been different"' upon consideration of that evidence." *Konz*, 2010 WL 5827402, at *9 (quoting *Evangelista v. Sec'y of Health & Human Servs.,* 826 F.2d 136, 140 (1st Cir. 1987)). "An implicit materiality

---

[17] "C5-C6" refers to the neck. *See Costa v. Astrue*, 565 F. Supp. 2d 265, 267-68 (D. Mass. 2008); *Church v. Astrue*, Civil Action No. 10-20336-FDS, 2012 WL 369424, at *3 (D. Mass. Feb. 2, 2012).

requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previous non-disabling condition." *Szubak v. Sec'y of Health & Human Servs.,* 745 F.2d 831, 833 (3rd Cir. 1984).

Plaintiff's new evidence fails to meet the two materiality requirements that are necessary for remand because the new MRI report does not relate either to the time period or to the alleged disabling condition that the ALJ considered.  First, the ALJ denied benefits from July 31, 2011 through September 17, 2013, the date of her decision (A.R. at 28, 39).  The new MRI report is dated two years later (Dkt. No. 18-1).  *See Beliveau,* 154 F. Supp. 2d at 95.  In addition, the new MRI report of the condition of Plaintiff's neck at C5-C6 differs from Plaintiff's claim of disability due to chronic lower back pain and depression (Dkt. No. 18-1; A.R. at 34, 634).  *Id.*  As acknowledged by the Commissioner, Plaintiff remains free to reapply for benefits if her condition has deteriorated or if she has a new disability (Dkt. No. 24 at 19 n.7).

V.     CONCLUSION

For the reasons stated above, Plaintiff's motion for an order reversing the Commissioner's decision (Dkt. No. 18) is DENIED, and the Acting Commissioner's motion to affirm the decision (Dkt. No. 24) is GRANTED.

It is so ordered.

Dated:  May 25, 2016                                   /s/ Katherine A. Robertson
                                                       KATHERINE A. ROBERTSON
                                                       United States Magistrate Judge